IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


RONALD TRAMMELL                    :
                                   :
        v.                         : Civil Action No. CCB-02-226
                                   :
BALTIMORE GAS & ELECTRIC           :
CO., et al.                        :


**MEMORANDUM**

Now pending before the court is a motion for summary
judgment brought by defendants Baltimore Gas & Electric
Company and Constellation Energy Group ("Defendants" or
"BGE").  This matter has been fully briefed and no hearing is
necessary.  Local Rule 105.6.  A description of the case is as
follows.

Plaintiff Ronald Trammell ("Plaintiff" or "Trammell"), an
African-American male, was employed by BGE from approximately
1972 until September 2000.  While he occupied various
positions during his tenure at BGE, at all times relevant to
this litigation, Trammell worked as a material handler on the
night shift at BGE's Rutherford Business Center.  In his
memorandum, Trammell indicated that he "was the only African-
American material handler on the midnight shift," as his co-
workers included Richard Ullman, Robert Kloch, Ronald
Lubinski, and Michael Wilson (the lead material handler), all

of whom are Caucasian males.  (Pl.'s Opp. Mem. at 2.)  At his
deposition, however, Trammell stated that his co-workers on
the night shift also included Sean Stepney, Mike Balzano,
James McVay, and Bill Edison (id. at Ex. 1, Trammell Dep., at
62-63); it appears from the record that Stepney and McVay are
African-American males.  (Defs.' Mem. at Ex. 2, McKim Dep., at
76-77.)  The night shift was supervised by John Trabert, a
Caucasian male, until approximately March 2000 when David
McKim, also a Caucasian male, assumed the supervisor
position.[1]  (Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 62-
65; Defs.' Mem. at Ex. 1, Suehle Aff., at ¶ 2.)  McKim
reported to Joseph Suehle, the Director of Material
Distribution.  (Defs.' Mem. at Ex. 1, Suehle Aff., at ¶ 2.)

Trammell's employment with BGE was terminated on
September 20, 2000.  (Id. at Ex. 16.)  According to BGE, the
"decision was based on [Trammell's] three unexcused absences
dated July 12, 2000, August 18, 2000, and September 13,
2000."[2]  (Id.)  The gravamen of Trammell's complaint, however,

---

[1]McKim also supervised the second shift, which included
some African-American employees, including a man named
Trillane Hill, as will be discussed later.  (Defs.' Mem. at
Ex. 2, McKim Dep., at 76-77.)

[2]The defendants' answers to interrogatories, however,
state that Trammell "was terminated for violating Company
policy regarding unexcused absences on several occasions,"
including one on or about May 2, 2000.  (Pl.'s Opp. Mem. at
Ex. 12, Defs.' Answers to Interrogs., at 2-3.)

is that the defendants discriminated against him on the basis of race during his tenure at BGE, culminating in the decision to terminate his employment. (Compl.) Therefore, a discussion of BGE's policies, Trammell's attendance record, and Trammell's allegations of racial discrimination ensues.

The BGE Employee Handbook[3] states that employees shall "[c]hoose [their] vacation dates, subject to [their] supervisor's advance approval, based on operating conditions." (Defs.' Mem., Ex. 4A at 00602.) Similarly, if employees will be absent from or late to work because of sickness or other unexpected occurrence, such as "an auto accident on the way to work," they shall "[c]ontact [their] supervisor . . . [and] [g]ive such notice at least one-half hour before [their] normal starting time if absence relief must be arranged, and within one-half hour after [their] normal starting time in all other situations."[4] (Pl.'s Opp. Mem., Ex. 9 at 00473.) The

---

[3] The plaintiff and defendants attached various excerpts of the BGE Employee Handbook to their papers. (See Defs.' Mem. at Ex. 4A; Pl.'s Opp. Mem. at Ex. 9.) Although one version appears to be an online copy, both list an effective date of May 17, 1999. (Id.) Trammell indicated at his deposition that he possessed a hard copy of the handbook and had access to the online version. (Defs.' Mem. at Ex. 3, Trammell Dep., at 126-27.)

[4] The BGE Employee Handbook anticipates that supervisors will establish their own procedures for requesting leave. (See, e.g., Defs.' Mem., Ex. 4A at 00601) ("Your supervisor is responsible for . . . taking appropriate corrective action . . . when you fail to report as scheduled. This also includes taking appropriate corrective action when you fail to report

record reveals that material handlers from the second shift
are asked to stay and provide coverage when night shift
employees are absent or late and when operating conditions so
demand. (<u>See, e.g.</u>, Defs.' Mem. at Ex. 1, Suehle Aff., at ¶
5; <u>id.</u> at Ex. 4, McKim Aff., at ¶¶ 4-5; <u>see also</u> <u>id.</u> at Ex. 3,
Trammell Dep., at 123.)  Accordingly, it is imperative that
material handlers provide advance notice of any absence or
lateness, according to the defendants, so that the supervisor
or lead material handler may determine whether coverage from
the second shift is necessary. (<u>Id.</u> at Ex. 1, Suehle Aff., at
¶ 5; <u>id.</u> at Ex. 4, McKim Aff., at ¶¶ 4-5.)  Significantly,
Trammell himself testified that he understood employees were
required to call one-half hour before the beginning of their
shift to request any time off. (<u>Id.</u> at Ex. 3, Trammell Dep.,
at 91.)

The BGE Employee Handbook also stipulates that "[a]ny

---

for Call-Ins in accordance with procedures established by your
supervisor.") McKim testified that pursuant to his own policy,
employees were required to call one-half hour before the
beginning of the shift "for sickness or something that is
going to cause [the employee] to be late." (Defs.' Mem. at
Ex. 2, McKim Dep., at 104-05.)  In order to request a
previously unscheduled vacation day, employees were obligated
to call at least three hours prior to the beginning of their
shift. (<u>Id.</u>)  Trammell testified that he was generally
unaware of McKim's personal policies; Trammell's
understanding, rather, was that employees were required to
call one-half hour before the beginning of their shift to
request any time off. (Defs.' Mem. at Ex. 3, Trammell Dep.,
at 91.)

time . . . . absence from work is unauthorized . . . [it is]
considered to be . . . an unexcused absence.  This includes
situations in which [employees] failed to properly notify
[their] supervisor of [their] absence." (Defs.' Mem., Ex. 4A
at 00600.)  Failure to properly report an absence or lateness
"is in itself a cause for Corrective Action unless it is later
determined, in [the] supervisor's judgment, that it was
considered impractical . . . to have done so (such as being
hospitalized, involved in an auto accident on the way to work,
etc.)." (Pl.'s Opp. Mem., Ex. 9 at 00473.)  The handbook
provides that a supervisor should issue a Corrective Action
Report ("CAR"), place the employee on probation, withhold pay
for the period of unexcused absence, and warn the employee of
the potential consequences of further infractions for the
first and second unexcused absences within a one-year period.
(Defs.' Mem., Ex. 4A at 00600.)  Upon the third unexcused
absence, the supervisor should "[s]uspend the employee with a
recommendation for discharge." (<u>Id.</u>)  If an employee has
"demonstrated a pattern of excessive absence and/or lateness
or . . . experienc[ed] other work performance problems, [the]
supervisor has the discretion to take more serious corrective
action, as appropriate." (<u>Id.</u>)

The record includes reports and testimony concerning
Trammell's attendance record and, specifically, various

instances when he purportedly violated BGE's employment
policies.  The first such instance occurred on or about
December 30, 1997.[5]  (Defs.' Mem. at Ex. 5.)  According to a
CAR dated January 13, 1998 and signed by Trammell,[6] the
plaintiff was scheduled to report to work at 11:00 p.m.  (Id.)
At 11:10 p.m., Trammell called and notified then-lead material
handler, Richard Ullman, that he was on his way to work.
(Id.)  There was no further contact from Trammell until 4:20
a.m., when he called, informed his co-worker that he was at
the hospital, and requested sick leave, which was subsequently
denied.  (Id.)  The report also notes that "[i]ncluding this
unexcused absence and most recent absence frequency of 1/2/98,
[Trammell] has now accumulated four full and one partial
absence frequency during the last 52 week cycle which
perpetuates a pattern of poor attendance over the last three
years requiring informal warnings on 8/23/96 and 2/27/97."

_____

[5] The plaintiff contends that events in this time frame
are irrelevant because BGE's disciplinary procedures pertain
to unexcused absences that fall within a one-year period only.
(Pl.'s Opp. Mem. at n.11, n.17.)  Insofar as these past events
demonstrate a "pattern of excessive absence and/or lateness,"
however, they are relevant according to the explicit terms of
the BGE Employee Handbook.  (Defs.' Mem., Ex. 4A at 00600.)
In addition, these past events are relevant to the issue of
pretext.

[6] Despite the fact that Trammell signed the CAR, he
testified at his deposition that he does not recall the
underlying incident or receiving the CAR.  (Defs.' Mem. at Ex.
3, Trammell Dep., at 116.)

(Id.)  As a result, Trammell "disrupt[ed] normal operations
and place[d] an unnecessary burden on co-workers," according
to the report.  (Id.)  Ullman substantiated the report at his
deposition when he testified that Trammell frequently violated
BGE's employment policies in that time frame and that he, as
lead material handler, spoke with Trammell about proper
procedures.  (Defs.' Mem. at Ex. 6, Ullman Dep., at 62-67.)
Ullman stated that he reluctantly reported the infractions to
supervisor John Trabert because "[a]t that point I felt I was
being taken advantage of some . . . You kind of tried to not
get somebody in hot water . . . as co-workers . . . but at
some point I had to do my job without fear of my own problem."
(Id. at 64-65.)  Ullman also testified that Trammell was the
only material handler on their shift who had repeated
attendance problems.  (Id. at 67-69.)

On or about May 2, 2000, according to reports drafted by
McKim, Trammell called Michael Wilson, the lead material
handler, at 10:35 p.m., five minutes after the shift began,
and requested a previously unscheduled vacation day because he
was at the airport picking up his mother.  (Defs.' Mem. at Ex.
7, 9.)  Wilson informed him that operating conditions required
his presence and, thus, he instructed Trammell to report to
work as soon as possible.  (Id.)  Trammell arrived at work
more than two hours later.  (Id.)  Trammell was permitted to

leave work early, however, because the shift completed its responsibilities earlier than anticipated. (<u>Id.</u> at Ex. 7.) McKim drafted a CAR in connection with this incident (<u>id.</u> at Ex. 9), but Suehle advised him to perform an informal "Coaching and Counseling" instead.[7] (<u>Id.</u> at Ex. 2, McKim Dep., at 120-22; <u>id.</u> at Ex. 7.) According to McKim and Wilson, they met with Trammell, reviewed the Coaching and Counseling report, and advised him of proper procedures pertaining to requesting leave. (<u>Id.</u> at Ex. 2, McKim Dep., at 124-26; <u>id.</u> at Ex. 8, Wilson Aff., at ¶ 3.) They also testified that Trammell did not sign the Coaching and Counseling report.[8] (<u>Id.</u> at Ex. 2, McKim Dep., at 130; <u>see</u>

---

[7] At approximately 9:00 p.m. on the same day, co-worker Ronald Lubinski called work seeking a previously unscheduled vacation day. (Defs.' Mem. at Ex. 4B.) Because McKim felt that the workload could be managed without Lubinski, McKim approved his request. (<u>Id.</u> at Ex. 4, McKim Aff., at ¶¶ 6-7; <u>id.</u> at Ex. 2, McKim Dep., at 103-06.) Although Lubinski called work approximately one and one-half hours prior to the beginning of the shift, he received a "Coaching and Counseling" for failure to adhere to McKim's personal policy of calling at least three hours before the beginning of the shift to request a previously unscheduled vacation day. (<u>Id.</u> at Ex. 4, McKim Aff., at ¶¶ 6-7; <u>id.</u> at Ex. 4B.) Given Lubinski's absence, Wilson believed that operating conditions required Trammell's presence when Trammell called at 10:35 p.m. seeking a previously unscheduled vacation day and, hence, Wilson denied his request (<u>id.</u> at Ex. 8, Wilson Aff., at ¶ 3); as stated, because the workload was lighter than Wilson originally estimated, Trammell was permitted to leave work early. (<u>Id.</u>)

[8] Although a Coaching and Counseling report is not a CAR, the BGE Employee Handbook provides that if an employee refuses to sign a CAR, "a third party (generally another supervisor)

also <u>id.</u> at Ex. 7; <u>id.</u> at Ex. 8, Wilson Aff., at ¶ 3.)

Trammell stated that he never received a Coaching and Counseling session in connection with the May 2000 incident; in fact, Trammell testified that he saw the Coaching and Counseling report for the first time at his deposition. (Defs.' Mem. at Ex. 3, Trammell Dep., at 128-32.)  Trammell, however, did recall the incident.  (<u>Id.</u>)  According to Trammell, he placed the call requesting a vacation day from a pay phone at the airport at approximately 10:35 p.m.  (<u>Id.</u> at 135.)  Although Trammell admitted that he knew he was expected at work that night and that it took between thirty and forty-five minutes to drive from his home to the airport, he offered no explanation as to why he failed to call work before he left for the airport.  (<u>Id.</u> at 132-35.)

According to a CAR drafted by McKim and signed by Trammell, on or about July 13, 2000, Trammell called McKim at 10:25 p.m. to inform McKim that he would be one hour late. (Defs.' Mem. at Ex. 11.)  There was no further contact from Trammell until almost 5:00 a.m., when he called, spoke with Wilson, and asked for vacation leave for the day.  (<u>Id.</u>)  The

---

is asked to witness that the corrective action was administered." (Pl.'s Opp. Mem., Ex. 9 at 00484.)  In this case, both McKim and Wilson signed the Coaching and Counseling report and testified that they were present when it was given to Trammell.  (Defs.' Mem. at Ex. 7; <u>see also id.</u> at Ex. 8, Wilson Aff., at ¶ 3; <u>id.</u> at Ex. 2, McKim Dep., at 124-25.)

CAR states that Trammell was advised of the potential consequences of future infractions and of the need "to give proper notification when he is requesting time off for unexpected reasons." (Id.) Consistent with the BGE Employee Handbook, Trammell also was placed on probation for three months. (Id.; see also id. at Ex. 2, McKim Dep., at 133-37.)

Trammell stated that he did not remember the July 2000 incident itself, but he did recall receiving a CAR, meeting with McKim to discuss it, and signing it. (Defs.' Mem. at Ex. 3, Trammell Dep., at 136-40.) In addition, while Trammell recalled the portions of the CAR indicating a formal warning was given and a three-month probation was commenced, he testified that the language, "Warned [Trammell] that the next unexcused absence may result in six months' probation and a 5 percent reduction in pay," was not typed on the report when he signed it. (Id. at 137-38; Defs.' Mem. at Ex. 11.)

According to correspondence and a CAR drafted by McKim, on or about August 10, 2000, Trammell neither reported to work on time nor notified McKim of his anticipated tardiness. (Defs.' Mem. at Ex. 12-13.) Trammell arrived at work more than four hours late and, as a result, personnel from the second shift were asked "to work overtime to cover for [Trammell's] absence." (Id. at Ex. 13.) The CAR states that McKim gave Trammell a formal warning, placed him on probation

for six months, reduced his pay, and warned him that "the next unexcused absence may result in his discharge from BGE." (Id.)  Trammell did not sign the CAR.  (Id.)  Although McKim only signed the CAR, Wilson testified that he witnessed a meeting between McKim and Trammell, during which they discussed the incident and the CAR, and Trammell thereafter refused to sign the report.  (Id. at Ex. 8, Wilson Aff., at ¶ 5.)

Trammell testified that he did not recall an August 2000 incident or a meeting with McKim and Wilson where the incident and a CAR were discussed.  (Defs.' Mem. at Ex. 3, Trammell Dep., at 147-49.)  In fact, Trammell stated that he had not seen the August 2000 CAR before his deposition.  (Id.)

On or about September 13, 2000, according to correspondence and a CAR drafted by McKim, Trammell called work at approximately 11:25 p.m., more than one hour after the beginning of his shift, and informed McKim that he would report to work in one-half hour.  (Defs.' Mem. at Ex. 15-16.) When asked why he did not call earlier, Trammell replied that he went to New York for the day and his train had just arrived at Baltimore's Penn Station.  (Id. at Ex. 16.)  McKim requested that Trammell report to work and bring his train ticket or other documentation confirming his trip.  (Id.) Trammell never reported to work or called McKim again that

night.  (Id.)  According to the CAR, Trammell met with Suehle

and Trabert on September 19, 2000, and explained that "he

tried to go back into the train station to get documentation

that would verify his trip, but the train station was locked."

(Id.)  Trammell added that he was "frustrated" and, thus,

decided not to report to work.  (Id.)  Management, through

independent investigation, discovered that the doors to Penn

Station are not locked until 12:00 a.m., and the CAR

references a provision of the BGE Employee Handbook pertaining

to the falsification of reasons for absence or tardiness

(Id.)  Noting that it was the "third Corrective Action in the

past two months," the CAR states that Trammell was thereby

suspended with a recommendation for discharge.  (Id.)

Trammell did not sign the CAR.[9]  (Id.)

    Trammell's account of the September 2000 incident is

substantially similar to the one offered by the defendants.

Trammell stated that he left Baltimore at approximately 11:30

a.m. that day to visit his aunt in Hackensack, New Jersey.

(Defs.' Mem. at Ex. 3, Trammell Dep., at 151-59.)  His return

train departed New York at approximately 8:00 p.m., and

Trammell conceded he knew at that time he would be late for

---

    [9] The CAR states: "Employee could not be reached on
9/21/00 and 9/22/00 to discuss this document.  Consequently,
this document was mailed to the employee's home."  (Defs.'
Mem. at Ex. 16.)

work.  (Id. at 161.)  Nevertheless, he did not call from New York because he believed, erroneously, that he "could probably call from the train." (Id. at 161-62.)  Trammell admitted that his train arrived in Baltimore after the beginning of his shift and that he called work only after he arrived at the station.  (Id. at 163-65.)  He recalled McKim's request for a train ticket, but speculated that he "tore it up." (Id. at 168-69.)  Since he paid for the ticket with cash, Trammell stated, he returned to Penn Station to obtain some documentation of his trip, but the doors were locked.  (Id. at 167-69.)  "[O]ut of frustration," Trammell decided to stay home from work that night.  (Id. at 170-71.)  Trammell recalled meeting with Suehle and Trabert on September 19, 2000, and having the opportunity to discuss the incident with them.  (Id. at 180-81.)

As stated, Trammell's employment with BGE was terminated on September 20, 2000.[10]  (Defs.' Mem. at Ex. 16.)  By letter dated October 3, 2000, BGE confirmed that Trammell requested a peer review hearing, which was scheduled for October 24, 2000.  (Id. at Ex. 18.)  Attached to the letter was an appeal form for Trammell's completion, as it was his responsibility "to

---

[10] Following Trammell's termination, there have been three openings for material handler trainee positions; McKim hired African-Americans for two of these positions.  (Defs.' Mem. at Ex. 4, McKim Aff., at ¶ 9.)

state for the panel why [he] believe[d] the level of
corrective action taken was not appropriate." (Id.)
Trammell's appeal form states that management "would not give
[him] days [he] want[ed]" and that he lost his job because he
"was late . . . but [no one] would give [him] time." (Id.)
After the hearing, the peer review panel concluded that the
level of corrective action administered was appropriate and,
thus, it upheld the decision to terminate Trammell. (Id.)

　　　Trammell commenced this suit pursuant to 42 U.S.C. § 1981
and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§
2000e, et seq.) ("Title VII"), alleging that he suffered
racial discrimination during his tenure at BGE, culminating in
his wrongful termination. (Compl.; Defs.' Mem. at Ex. 14,
Pl.'s Answers to Interrogs., at 5-9.) According to Trammell,
he was treated differently from his Caucasian co-workers
during his employment at BGE in the following three ways: he
was denied a requested training course (Pl.'s Opp. Mem. at 30-
31; id. at Ex. 1, Trammell Dep., at 243-46; Defs.' Mem. at Ex.
14, Pl.'s Answers to Interrogs., at 7); he received lower
bonuses than his Caucasian co-workers for the years 1997
through 1999 (Pl.'s Opp. Mem. at 31; Defs.' Mem. at Ex. 14,
Pl.'s Answers to Interrogs., at 9); and his peer review
hearing was discriminatory (id. at 12-14, 31-32; Defs.' Mem.
at Ex. 14, Pl.'s Answers to Interrogs., at 6-7; see also

Compl. at ¶¶ 8-13.)[11]  In addition, Trammell alleges that BGE

supervisors subjected him to harsher discipline than his

Caucasian co-workers; while many material handlers were late

to or absent from work, Trammell alleges that only he received

CARs and was terminated for such behavior.[12]  (Pl.'s Opp. Mem.

at 14-27; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs.,

at 6; Compl. at ¶ 11.)  To support his argument that he was

disciplined more severely because of his race, Trammell

alleges that he suffered discrimination in the following ways

---

[11] Trammell initially contended that he was treated
differently from his Caucasian co-workers during his
employment at BGE because supervisors refused to approve any
of his requests for unscheduled vacation days, while his co-
workers received approval routinely.  (Pl.'s Opp. Mem. at Ex.
1, Trammell Dep., at 82-85; Defs.' Mem. at Ex. 14, Pl.'s
Answers to Interrogs., at 9.)  Trammell did not pursue this
argument in his opposition memorandum.  (See Pl.'s Opp. Mem.)
In any event, Trammell was unable to offer any specific
details regarding the purported denials of his requests (see
Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 83-85), and McKim
testified that he never denied requests for vacation days that
were properly made by Trammell.  (Defs.' Mem. at Ex. 2, McKim
Dep., at 201-02; see also id. at Ex. 3, Trammell Dep., at 96-
97 (Trammell testifying that, "If I called at 10:30 to say I
needed vacation, I could never get it.  But he's telling this
man if he called him early, he could have got it.  So what's
the difference?").)

[12] The parties dispute whether this claim is appropriately
characterized as one for wrongful termination.  (See Defs.'
Mem.; Pl.'s Opp. Mem.; Defs.' Reply Mem.; Defs.' Mem. at Ex.
14, Pl.'s Answers to Interrogs., at 6.)  The plaintiff's
opposition memorandum makes clear that the claim charges
disparate discipline only.  (See, e.g., Pl.'s Opp. Mem. at 18-
22) (stating that the "relevant inquiry is 'whether employees
. . . involved in or accused of the same or similar conduct .
. . are disciplined in different ways'") (citation omitted).

during his employment at BGE: Trammell's co-workers were permitted to leave work early, particularly on days preceding scheduled vacations, while he was not (Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 70-73); Trammell was given a disproportionate share of the work (id. at 76-77, 201-02); McKim singled out Trammell and prohibited him from using his office during breaks (id. at 87-88); and, unlike his Caucasian co-workers, Trammell was required to ask permission to use the restroom (id. at 202; see also Pl.'s Opp. Mem. at 27-30.)[13]

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

---

[13] Trammell did not bring a hostile work environment claim against the defendants. (See Compl.; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs.; Pl.'s Opp. Mem.) Rather, as stated, Trammell contends that these alleged instances of discrimination are relevant to the issue of pretext. (Pl.'s Opp. Mem. at 29-30.) The court assumes, without deciding, that a hostile work environment claim would fail as a matter of law. See, e.g., Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001).

requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.</u>, 840 F.2d 236, 240 (4th Cir. 1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)).

As stated, the plaintiff claims that he was subject to race discrimination in violation of Title VII and 42 U.S.C. § 1981. Because he did not present any direct evidence of race discrimination, he proceeded under the burden-shifting scheme articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973). <u>See also</u> <u>Murray v. United Food & Commercial Workers Union, Local 400</u>, 229 F. Supp. 2d 465, 469 n.2 (D. Md. 2002) (stating that in the context of employment

discrimination, section 1981 claims are analyzed under a proof
scheme similar to Title VII claims). As a general matter, to
establish a prima facie case of employment discrimination, the
plaintiff must show that: "(1) [he] is a member of a protected
class; (2) [he] was performing [his] duties in a satisfactory
manner; (3) [he] was subjected to an adverse employment
action; and (4) [he] was treated differently [from] similarly
situated individuals outside of [his] protected class."
Nichols v. Harford County Bd. of Educ., 189 F. Supp. 2d 325,
340 (D. Md. 2002); see also Thompson v. Potomac Elec. Power
Co., 312 F.3d 645, 649-50 (4th Cir. 2002) (holding that in
order to establish a prima facie case of discriminatory denial
of training, the plaintiff must show that: "(1) the plaintiff
is a member of a protected class; (2) the defendant provided
training to its employees; (3) the plaintiff was eligible for
the training; and (4) the plaintiff was not provided training
under circumstances giving rise to an inference of
discrimination"); Bazemore v. Friday, 751 F.2d 662, 670 (4th
Cir. 1984), aff'd in part, rev'd in part on other grounds, 478
U.S. 385 (1986) (finding that in order to establish a prima
facie case of discrimination in pay, the plaintiff must show
that: (1) he is a member of a protected class; (2) he is as
qualified as employees not of the protected class; and (3) he
was paid less than other comparably qualified employees); cf.

Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993)
(holding that in order to establish a prima facie case of
disparate discipline, the plaintiff must show that: (1) he is
a member of a protected class; (2) "that the prohibited
conduct in which he engaged was comparable in seriousness to
misconduct of employees outside the protected class;" and (3)
"that the disciplinary measures enforced against him were more
severe than those enforced against those other employees").
If the plaintiff establishes a prima facie case, the burden of
production is placed on the defendant to state a legitimate,
non-discriminatory reason for the adverse employment action.
Nichols, 189 F. Supp. 2d at 340.  If the defendant articulates
such an explanation, the burden returns to the plaintiff to
show that the proffered reason is a pretext for impermissible
discrimination.  Murray, 229 F. Supp. 2d at 470.  Although the
burden of production shifts, the plaintiff retains the burden
of persuasion throughout all stages, see Burns v. AAF McQuay,
Inc., 96 F.3d 728, 731 (4th Cir. 1996), and the plaintiff must
present admissible evidence that is more than self-serving
opinions or speculation.  See Causey v. Balog, 162 F.3d 795,
801 (4th Cir. 1998); McCain v. Waste Mgmt., Inc., 115 F. Supp.
2d 568, 574 (D. Md. 2000).  In sum, the McDonnell Douglas
framework is not a rigid or mechanized scheme, but rather "'a
means to fine-tune the presentation of proof and, more

importantly, to sharpen the focus on the ultimate question --
whether the plaintiff successfully demonstrated that the
defendant intentionally discriminated against [him].'" 
Brinkley v. Harbour Recreation Club, 180 F.3d 598, 611 (4th
Cir. 1999) (quoting Ennis v. Nat'l Ass'n of Bus. & Educ.
Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995)).

    With regard to his training claim, Trammell asserts that
the defendants discriminated against him on the basis of race
when they denied his request for an advanced training course.[14]
(Pl.'s Opp. Mem. at 30-31; id. at Ex. 1, Trammell Dep., at
243-47.)  Trammell, however, did not establish that BGE
provided such training to material handlers or that he was
eligible for it.  Significantly, it does not appear that any
of Trammell's former co-workers attended the training course
requested by Trammell.  (Id. at Ex. 1, Trammell Dep., at 243-
47.)  In addition, McKim testified that there is no
entitlement to formal training and that supervisors must
determine an employee's need for certain skills, ability to
understand the material, and potential for advancement in the
company before approving any training courses.  (Id. at Ex. 2,

_____

    [14] Trammell initially asserted that he was also denied
basic skills training in late 1999.  (Defs.' Mem. at Ex. 14,
Pl.'s Answers to Interrogs., at 7.)  At his deposition,
however, Trammell explained that he did not pursue this
training course, designed to orient employees with a new
computer system, because BGE delayed the system's
implementation.  (Id. at Ex. 3, Trammell Dep., at 246-47.)

McKim Dep., at 193-200.)  The only detail that Trammell could recall about the course he requested to attend was that "it was to better yourself as far as your speech and handwriting and different things." (<u>Id.</u> at Ex. 1, Trammell Dep., at 244.) Trammell did not even aver, however, that he needed improvement in those areas or that he desired a new position for which those skills were useful. (See <u>id.</u> at 243-47.)  The only support for the plaintiff's theory that he was denied this training on the basis of race is the fact that one Caucasian employee named Pat Maraugha received the training requested by Trammell. (<u>Id.</u> at 246; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 7.)  Maraugha, however, did not occupy the same position at BGE as did the plaintiff.[15] (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 193.)  Accordingly, Trammell has presented no evidence whatsoever suggesting that he was denied training "under circumstances giving rise to an inference of discrimination," which is required to establish a prima facie case of discriminatory denial of training. <u>See</u> <u>Thompson</u>, 312 F.3d at 649-50.

Trammell also charges that he received lower bonuses or

---

[15] McKim described Maraugha's position as "a material handler driver, a slasher.  It is a job on the midday shift where a gentleman works in the warehouse and drives a truck." (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 193.)  At his deposition, Trammell did not identify Maraugha as a former co-worker (<u>see</u> Defs.' Mem. at Ex. 3, Trammell Dep., at 62-63), or mention his name apart from his testimony regarding training.

Result Incentive Awards ("RIAs") for the years 1997 to 1999 on the basis of race.  As support for this proposition, Trammell attached his annual performance evaluations, his RIA reports, and the RIA reports of Kloch and Ullman.  (Pl.'s Opp. Mem. at Ex. 6, 15-17.)[16]  During the 1997 to 1999 time frame, Trammell received scores of four or five in all areas on his performance evaluations (five being "full proficiency"), and yet his RIAs were somewhat lower than Kloch's and Ullman's. (Id.)  Significantly, however, the plaintiff did not attach Kloch's or Ullman's performance evaluations, or the evaluations and RIA reports of any other former co-workers from his shift (such as Lubinski, Stepney, Balzano, McVay, Edison, or Wilson) or from other shifts under McKim's or Trabert's supervision (such as Hill).  According to Suehle, RIAs are "determined in part by the level of contribution of an individual employee."  (Defs.' Reply Mem. at Ex. 1, Suehle Aff., at ¶ 3.)  Since a "level [five] on a job proficiency . . . means [only] that an employee is adequately meeting all of the requirements of his job . . . several employees who are all at a level [five] may be treated differently under the RIA system."  (Id. at ¶¶ 2-3.)  Trabert testified that Trammell received lower RIAs than Kloch and Ullman "because Mr.

---

[16] The contents of Exhibits 15, 16, and 17 were placed under seal by Order of this court on February 11, 2003, to protect the personal information of third parties.

Trammell's performance and contribution was [sic] not as good
as those Material Handlers [sic]." (Defs.' Mem. at Ex. 20,
Trabert Aff., at ¶ 5.) Accordingly, without having submitted
the performance evaluations of Kloch or Ullman (or any other
material handler), the plaintiff did not show that he was as
qualified as they were. See Bazemore, 751 F.2d at 670. In
addition, the plaintiff "has presented no admissible
statistical data, which is often essential with such claims."
McCain, 115 F. Supp. 2d at 576 (citing Carter v. Ball, 33 F.3d
450, 456 (4th Cir. 1994)); see also Obi v. Anne Arundel
County, 142 F. Supp. 2d 655, 674-75 (D. Md. 2001). The
plaintiff, therefore, did not establish a prima facie case of
race discrimination with respect to the RIAs, and in any
event, did not rebut BGE's legitimate, non-discriminatory
reason for assessing the bonuses as it did.

The plaintiff further submits that he was discriminated
against on the basis of race in connection with his peer
review hearing.[17] (Pl.'s Opp. Mem. at 31-32.) In sum,

---

[17] Trammell states in his complaint and answers to
interrogatories that his disparate treatment claims are based,
in part, on his peer review hearing. (Compl. at ¶ 12; Defs.'
Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6-7.) In
Trammell's opposition memorandum, however, after contending
that his peer review hearing was discriminatory, he submits
that he "does not contend that Defendants' conduct with
respect to the hearing constitutes a separate claim of
discrimination, for which Plaintiff seeks separate relief."
(Pl.'s Opp. Mem. at 32.) Given the uncertainty of Trammell's
posture, the court will address his arguments regarding his

Trammell contends that the peer review hearing was unfair
because he was not permitted witnesses to testify on his
behalf and the panel never considered whether BGE
discriminated against him on the basis of race. (Id.; Defs.'
Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6-7.) Marilyn
Gibson, BGE human relations employee and the facilitator of
Trammell's hearing,[18] testified that Trammell's five-member
panel consisted of three non-supervisors and two supervisors,
three of whom, the defendants proffer, are African-Americans.
(Id. at Ex. 5, Gibson Dep., at 21; Defs.' Mem. at 26.) Gibson
explained that upon reading the appeal form and listening to
the appellant, the panel members determine whether they would
like to hear from witnesses. (Pl.'s Opp. Mem. at Ex. 5, Gibson
Dep., at 26-27, 30, 52-53.) As stated, on Trammell's appeal
form, he merely claimed that management would not give him
time off and that he was fired because he was late to work.
(Defs.' Mem. at Ex. 18.) Importantly, Trammell did not
mention racial discrimination on his appeal form (id.); it is
not surprising, therefore, that race was never discussed at

---

peer review hearing as if they constitute claims or some part
thereof.

    [18] Gibson is African-American. (Pl.'s Opp. Mem. at Ex. 5,
Gibson Dep., at 32.) The facilitator, however, does not vote
and is only "responsible to keep the panelists focused to
ensure a timely decision." (Id. at Ex. 9; see also Defs.'
Mem. at Ex. 17, Gibson Dep., at 11, 20, 46.)

his hearing. (Pl.'s Opp. Mem. at Ex. 5, Gibson Dep., at 73.)
Moreover, the plaintiff does not present any evidence that his
own hearing deviated from the standard procedure, as
memorialized in the BGE Employee Handbook and affixed by the
plaintiff to his memorandum. (<u>Id.</u>, Ex. 9 at 00481-00482;
Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 8.)
Given the foregoing, the court concludes that Trammell has not
submitted any evidence suggesting that he was treated
differently from similarly situated individuals outside his
protected class or that BGE discriminated against him on the
basis of race in conducting his peer review hearing.

Finally, Trammell alleges that he was subject to harsher
discipline than his Caucasian co-workers for lateness and
absence from work. Trammell attempted to establish the second
element of the prima facie case, "that the prohibited conduct
in which he engaged was comparable in seriousness to
misconduct of employees outside the protected class," <u>Cook</u>,
988 F.2d at 511, through reference to some of his former co-
workers.[19]

_____

[19] Throughout his opposition memorandum, Trammell
misconceives the nature of his own misconduct, noting once,
for example, that "all of the white material handlers were
late or had unscheduled absences during the relevant time
frame, thus engaging in the same prohibited conduct." (Pl.'s
Opp. Mem. at 21.) Trammell's employment was not terminated
because he was late or had <u>unscheduled</u> absences, but rather
because he had <u>unexcused</u> absences resulting from his failure
to request leave sufficiently in advance of his shift.

According to Trammell, Ullman[20] was late to work "a couple times," once because he was involved in a car accident. (Defs.' Mem. at Ex. 3, Trammell Dep., at 237-39.)  Trammell did not know how late Ullman was on these occasions or, importantly, whether he called his supervisor in advance to receive approval for leave.  (Id. at 238-39.)  In fact, Ullman testified that it was his practice to call his supervisor several hours before the beginning of his shift to inform him of his anticipated lateness or absence.  (Pl.'s Opp. Mem. at Ex. 3, Ullman Dep., at 43-44, 46.)  To the best of his recollection, McKim testified that Ullman did not have any unauthorized absences.  (Id. at Ex. 2, McKim Dep., at 101.)

Regarding Wilson, Trammell proffered that he called work one night during the shift and stated that he "might be in,

--------

(Defs.' Mem. at Ex. 16.)  The key inquiry, therefore, is whether Trammell's former co-workers timely requested and received their supervisor's authorization for their unscheduled leave -- not whether they were ever late to or absent from work due to illness or other unexpected occurrence.

In addition, the record reveals that Trammell was absent for 416 hours of sick leave from January 1, 2000 until his termination in September 2000.  (Defs.' Reply Mem. at Ex. 1, Suehle Aff., at ¶ 4.)  It is undisputed that Trammell was not disciplined for taking sick leave, thus underscoring the important distinction between unscheduled and unexcused absences.

[20] Ullman testified that he stopped working the night shift in approximately April 2000 and, hence, he only reported to McKim for a short period of time.  (Defs.' Mem. at Ex. 6, Ullman Dep., at 20-21, 51.)

might not;" Wilson purportedly did not report to work that night. (Defs.' Mem. at Ex. 3, Trammell Dep., at 225-27.) Trammell, however, did not even remember the year this incident allegedly occurred, nor did Trammell know if Wilson ever spoke with a supervisor to seek leave or why Wilson needed to take leave that night. (<u>Id.</u> at 226-27.) To McKim's recollection, Wilson did not have any unauthorized absences. (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 77-78.)

Trammell did not recall Lubinski having any attendance problems. (Defs.' Mem. at Ex. 3, Trammell Dep., at 236-37.) As stated, however, Lubinski received a Coaching and Counseling in May 2000 for seeking a previously unscheduled vacation day too soon before the beginning of the shift. (<u>Id.</u> at Ex. 4, McKim Aff., at ¶ 6; <u>see also</u> <u>id.</u> at Ex. 4B; Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 103-07.) Aside from that one instance, McKim did not recall Lubinski having any unauthorized absences or lateness. (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 106.)

Most of the testimony involving Trammell's former co-workers centered on Kloch. Trammell testified that Kloch was late to work "several times," once because he left his glasses at home, once because he lost his keys, and once because he was late returning from a golf outing. (<u>Id.</u> at Ex. 1, Trammell Dep., at 230-31, 233-36.) Trammell, however, did not

remember the years these incidents allegedly occurred, nor did
Trammell know if Kloch called work in advance and received
approval for leave. (Id.) Kloch testified that, on one
occasion, he called work soon before the shift began to notify
his supervisor that he would be one-half hour late. (Id. at
Ex. 4, Kloch Dep., at 42-44.) Otherwise, Kloch testified, it
was his practice to call work at least one hour before the
beginning of the shift to request leave. (Id. at 103-08.) To
McKim's recollection, Kloch did not have any unauthorized
absences or lateness. (Id. at Ex. 2, McKim Dep., at 84-85.)

Trammell also averred that Kloch was "famous" for
reporting to work drunk on Wednesdays after his golf outings;
according to Trammell, "he could hardly stand up" on certain
occasions. (Id. at Ex. 1, Trammell Dep., at 231-39.) Ullman
indicated, with equivocation, that he suspected Kloch might
have come to work under the influence of alcohol. (Id. at Ex.
3, Ullman Dep., at 72-73) ("In my mind I may have [suspected
Kloch had been drinking] . . . but I never went and said 'You
been drinking,' or something like that . . . Lots of guys look
like that").) Trammell never reported his suspicions to a
supervisor, despite his knowledge that Kloch was operating
heavy machinery at those times. (Id. at Ex. 1, Trammell Dep.,
at 231-32.) McKim testified that he never observed Kloch to
be drunk at work, nor did anyone report such suspicions to

him.  (Defs.' Mem. at Ex. 2, McKim Dep., at 86-88.)  Kloch
admitted that he played golf approximately one Wednesday a
month, but denied that he drank alcohol while golfing and that
he ever came to work under the influence of alcohol.  (Defs.'
Reply Mem. at Ex. 19, Kloch Dep., at 121-25, 130-33, 140.)  In
addition, Kloch maintained that he was never late to or absent
from work because of his golf outings.  (Id. at 132.)

McKim added that Trillane Hill, an African-American
employee under his supervision on the second shift, also
received a Coaching and Counseling for an attendance matter.
(Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 77-78.)  While the
record is devoid of details concerning Hill's Coaching and
Counseling, McKim stated that Hill had "a number of personal
problems involving his family" that caused him "to call
[McKim] a number of times at the last minute or late, [to] say
[he is] going to the hospital with [his] wife, this or that"
and that McKim considered Hill's situation as "an extenuating
circumstance" that he took into account in disciplining Hill.
(Id. at 81.)

Considering the foregoing, the court concludes that
Trammell has presented no evidence whatsoever "that the
prohibited conduct in which he engaged was comparable in
seriousness to misconduct of employees outside the protected
class."  Cook, 988 F.2d at 511.  Although "the reality [is]

that the comparison will never involve precisely the same set
of work-related offenses occurring over the same period of
time and under the same sets of circumstances," id., none of
Trammell's former co-workers was shown to have called work in
an untimely fashion requesting leave, or otherwise to have had
unauthorized absences or lateness, on numerous occasions in a
one-year period. (See also Pl.'s Opp. Mem. at Ex. 1, Trammell
Dep., at 150.) In fact, the record reveals that Lubinski, a
Caucasian employee, also received a Coaching and Counseling
for one infraction of the attendance policy, while Hill, an
African-American employee, apparently only received one
Coaching and Counseling for numerous such infractions.
Although the allegations of Kloch's drinking have not been
substantiated, even if true, there is no evidence that McKim
or any BGE supervisor actually knew of such conduct.
Consequently, BGE had a reasonable basis for disciplining
Trammell, but not Kloch, because it had evidence before it
that Trammell had violated company policy. In sum, Trammell
produced only self-serving testimony to support his claim that
Caucasian employees similarly violated company policy, but
were not disciplined as harshly as he. The second element of
Trammell's prima facie case of disparate discipline,
therefore, stands wholly unsupported.

    In any event, Trammell offered no reliable evidence to

demonstrate that BGE's rationale for disciplining Trammell,
but not his former co-workers, was a pretext for
discrimination.  McKim denied giving preferential treatment to
Caucasian employees and singling out Trammell by banning him
from his office during breaks and requiring him to ask
permission to use the restroom (Pl.'s Opp. Mem. at Ex. 2,
McKim Dep., at 109-10); nor did any of Trammell's former co-
workers substantiate his allegations.  (<u>Id.</u> at Ex. 3, Ullman
Dep., at 94-96; <u>id.</u> at Ex. 4, Kloch Dep., at 142-45.)  The
defendants' motion for summary judgment, thus, will be
granted.

A separate Order follows.


<u>     August 28, 2003     </u>                    <u>          /s/          </u>
Date                                  Catherine C. Blake
                                 United States District Judge